# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOSE VARELA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 05 C 7067 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| ROCK-TENN COMPANY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before this Court is defendant Rock-Tenn Company's ("Defendant") motion for summary judgment against plaintiff Jose Varela ("Plaintiff"). For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

**I.     FACTS**

Plaintiff was hired by Defendant for a bargaining-unit position in 1978 at the Aurora plant. Defendant's primary business is manufacturing paperboard. In 2000, Plaintiff was promoted from a bargaining-unit position to Converting Supervisor, where he remained until his layoff in 2004. The Supervisor position is a salaried, managerial position.

Prior to May 2004, Defendant's plant had both a Paperboard Department and a Laminating Department; both departments produced paperboard that was then sent to the Converting Department to be cut to customer specifications. Jose Vazquez (date of birth June 6, 1957) was Converting Supervisor for the first shift, Plaintiff (date of birth June 27, 1959) was Converting Supervisor for the second shift, Jose Vizcarra (date of birth March 9, 1967) was Converting Supervisor for the third shift. At the time of termination, Plaintiff was 45 years old, and Vizcarra was 37 years old.

The Converting Supervisors reported to the Converting Superintendent, who until May 2004 was Roger Miller. On May 3, 2004, Miller was replaced with Steve Iniquez. The General Manager, with final decision-making authority as to layoffs, was Paul Wilson.

Early in 2004, Defendant announced a price increase for its laminated paperboard products. As a result, in April and May 2004, Defendant reports to have lost its two biggest customers for laminated products, as well as suffered significant decrease in purchases by other customers. These losses caused a reduction of more than 50% in the volume of laminated products manufactured in Aurora.

Due to the reduced production of laminated products, Defendant reduced the Converting Department from three shifts to two. Around this time, Wilson held a meeting with Iniquez and Dennis Gabel, who was then the Human Resources and Safety Manager. Wilson told Iniquez to

start evaluating the three Converting Supervisors to determine which he would recommend for retention. Wilson did not give Iniquez specific guidelines by which to make a recommendation.

On June 13, 2004, the plant's hourly workers went on strike. As a result, the company transferred several management employees between departments. Vizcarra ran machines alongside Plaintiff and some temporary employees at this time. Iniquez supervised both Vizcarra and Varela. During this time, Plaintiff was feeling sick and claims he was working at 50 or 60 percent of his capacity. Iniquez told Plaintiff he could go home if he was feeling sick. Plaintiff declined.

On June 15, 2004, Defendant announced that it was shutting down its laminating operations and exiting the laminated paperboard market. Wilson decided that the Converting Department would have to be further reduced, from its current two shifts to one shift. Wilson notified Iniquez that day that he had to recommend one of the three supervisors to retain.

Wilson claims he made his decision to retain Vizcarra over Plaintiff and Vazquez approximately two weeks later on June 25, 2004. The strike continued until July 2, 2004. Most of the plant was closed through July 5, 2004 for Independence Day. The salaried employees were notified of their layoffs the week of July 6, 2004. Plaintiff entered the hospital on July 5, 2004, and was diagnosed with pneumonia, and did not receive his layoff notice the week of July 6, 2004. On July 9, 2004, Plaintiff left the hospital with doctor's instructions not to return to work until July 14, 2004. On July 14, 2004, Wilson told Plaintiff that he was laid off.

Plaintiff acknowledged that Vizcarra "had better communication" with Iniquez than he did during the strike, particularly because Vizcarra helped Iniguez understand how to cut things properly. Plaintiff also acknowledges that he "didn't have much knowledge" of three of the

newer machines in the Converting Department, whereas Vizcarra "had the proper training" on them and operated them during the strike.

A few days after he was informed of his termination, Plaintiff requested to return in a "lead man" position in the Converting Department.[1] The request was denied. Wilson claims that the denial was due to his concern about Plaintiff's willingness to work under Vizcarra's supervision, that Plaintiff did not have the mechanical skills to perform the position, and that there was no lead man position available at the time.

Plaintiff filed age discrimination charges with the Illinois Department of Human Rights (IDHR) and Equal Employment Opportunity Commission (EEOC) on July 21, 2004. On September 17, 2004, Iniquez sent an email to Wilson detailing his reasons for choosing to retain Vizcarra.[2] On October 4, 2004, Defendant issued its Position Statement in response to Plaintiff's IDHR claim. The EEOC issued Plaintiff a Right to Sue letter on September 16, 2005. Plaintiff filed a complaint with this court on December 15, 2005.

## II. SUMMARY JUDGMENT STANDARD

---

[1] Plaintiff did not mention this alleged failure to reassign him the "lead man" position in his EEOC charge, and for purposes of this instant complaint, this count assumes that the issue is the Defendant's decision to keep Vizcarra as the sole supervisor.

[2] Iniquez's reasons were: (1) Vizcarra showed more potential for improvement overall, (2) Vizcarra had better communication skills, (3) during the evaluation period, Vizcarra was complimented more than once by the Laminator Superintendent for attention to detail and work ethic, (4) Vizcarra showed a willingness to whatever it took to get the job done, at all times, (5) during the strike, Vizcarra prepared better and ran his area of responsibility with better leadership, (6) Vizcarra took control of the floor during the strike, and made things happen, (7) Vizcarra continued to do the detail work of production reporting in Kiwi and on paper during the strike, while Varela did not and (8) Vizcarra gave up his vacation during the strike when needed, and never missed work when assigned.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue of fact. Such a showing entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists only when a reasonable factfinder could find for the nonmoving party, based on the record as a whole. The court does not weigh the evidence and it does not make credibility determinations. Instead, the court makes all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). If a party fails to present proof on an essential element of his or her case, then all other facts become necessarily immaterial. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 509 (7th Cir. 1999).

### III. ANALYSIS

**ADEA Claim**

Defendant moves for summary judgment on the grounds that Plaintiff cannot establish a genuine issue of material fact under the ADEA. Under the ADEA, a plaintiff must show proof of age discrimination by either the direct or indirect methods. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Under the direct method, Plaintiff can avert summary judgment "by presenting enough evidence, whether direct or circumstantial, of discriminatory motivation to create a genuine issue for trial." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus. *Id*. Circumstantial evidence consists of "ambiguous

statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Sylvester v. SOS Children's Vills Ill., Inc*., 453 F.3d 900, 903 (7th Cir. 2006).

The indirect method, under the McDonnell-Douglass framework for Title VII cases, applies to ADEA claims. *Raymond v. Ameritech Corp*., 442 F.3d 600, 610 (7th Cir. 2006); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (U.S. 1973). Under the indirect method, plaintiff must first establish a prima facie showing of discrimination by a preponderance of the evidence. *Id.* Second, if the plaintiff is successful, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. Third, if the defendant satisfies his burden, the plaintiff must then show by a preponderance of the evidence that the legitimate reasons stated by the defendant were not its true reasons, but were pretext for discrimination. *Id.*

### A. The Direct Method

Plaintiff claims that he has sufficient circumstantial evidence to create a "convincing mosaic" that would allow a jury to infer intentional discrimination by the decisionmaker. Plaintiff argues that two affiants heard Gabel, the Human Resources Director, comment that older workers are not as efficient as younger employees, they do not produce as much as younger employees, and are not as worried about learning new technique and bettering themselves as younger employees. Plaintiffs allege that Gabel was involved in the decision to layoff Plaintiff, and thus, there is direct evidence of age discrimination. We disagree.

The problem with relying on Gabel's comments as direct evidence is that both the timing of the comments and the persons to which the comments were addressed are too tenuous to infer discrimination to the Plaintiff. The two affiants, Jesus Cervantes and Leonard Cervantes, heard Gabel's comments during safety meetings, held approximately once a month. However, neither affiant had attended a safety meeting since 2000, four years prior to Plaintiff's termination. In *Schuster v. Lucent Techs., Inc*., the Seventh Circuit found that comments made five months before termination were not temporally related to the discharge decision. 327 F.3d 569, 575 (7th Cir. 2003). In the present case, comments made at least four years prior to the termination are clearly too tenuous. Further, the direct method requires such comments to be "related to the employment decision in question." *Id.* (quoting *Wichmann v. Board of Trustees*, 180 F.3d 791 (7th Cir. 1999)). There is insufficient connection to suggest that Gabel's comments made during safety meetings four years prior had any bearing on Plaintiff's termination in the case at hand, even if Gabel was involved in the decision-making process. The comments are simply too tenuous in time and target. As such, Plaintiff does not survive summary judgment under the direct method.

B.     The Indirect Method

Defendant motions for summary judgment on the ground that Plaintiff cannot show similarly situated employees were treated more favorably, and Plaintiff cannot show pretext. As to pretext, Plaintiff claims that Defendant's pretextual motive can be shown by its changing stories, which "calls truthfulness into question." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672 (7th Cir. 2003). Plaintiff asserts that an email written by Iniguez on September 17,

2004, two months after Plaintiff's termination, stated reasons for Plaintiff's termination involving the strike, which ended July 2, 2004. These reasons included that Vizcarra "took control of the floor during the strike, and made things happen," and "he gave up his vacation during the strike when needed, and never missed work when assigned." Plaintiff argues that since Defendant references the strike, and the strike did not end until July 2, 2004, the termination decision must have been made after July 2, 2004, and is inconsistent with Defendant's claim that the termination decision was made by June 25, 2004. This argument is plainly misconstrued. While the strike may have ended after June 25, 2004, it started on June 13, 2004, 12 days prior to June 25, 2004. This certainly gave Iniquez sufficient time to make observations during the strike regarding work performance. The fact that Iniquez's email in September 2004 referenced the strike is not proof that the layoff decision was made after the strike ended; only that it was made after the strike *began*. This is consistent with the timing offered by the Defendant. Further, the timing of Iniquez's September 2004 email, written two months after the layoff, is reasonable. Defendant explains that Iniguez's email, explaining the reasons for choosing Vizcarra over Plaintiff, was written two months later, because Plaintiff had filed a discrimination claim with the IDHR. The email was written in order to respond to Plaintiff's discrimination claim. This does not suggest a changing story, but only a clarification of reasoning. There is insufficient evidence to show contradictory reasons or changing stories.

Plaintiff wishes to analogize the present case to *Zaccagnini v. Chas. Levy Circulating Co.*, where it was found that new explanations put into question the truthfulness of defendant's motivations. 338 F.3d 672 (7th Cir. 2003). *Zaccagnini* is inapposite to the present case. In *Zaccagnini*, new and inconsistent explanations were produced in the reply brief for summary

judgment. In the present case, multiple and consistent reasons were given before the complaint was ever filed in federal court. The fact that Defendant had multiple reasons for termination does not call into question truthfulness. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992). It is only when there are new explanations that are inconsistent with prior stated reasons that *Zaccagnini* may be used to suggest pretext. Defendant offers no evidence of new nor inconsistent reasoning in the present motion.

Further, Plaintiffs assert that Defendant referenced certain Competency Agreements and Performance Reviews from 2000 and 2001 that it relied on in choosing to retain Vizcarra over Plaintiff, but later Wilson denied that he used such evaluations. Defendant asserts that the 2000 and 2001 evaluation, while not used by Wilson, is not contradictory because Iniquez was also involved in evaluating the Plaintiff and could have used the evaluations. Not supplying every detail is not the same as asserting contradictory information. The fact that Defendant reported using the 2000 and 2001 evaluations does not mean Wilson personally perused them when others were involved in the decision-making process as well. To claim that this, in itself, is pretextual reasoning is insufficient. Plaintiff fails to show contradiction in Defendant's reasoning, and has provided no other proof of pretextual motive.

For the foregoing reasons, summary judgment is granted for the Defendant as to the ADEA claim.

**FMLA Claim**

Defendant moves for summary judgment of the FMLA claim on the grounds that the evidence produces no genuine issue of material fact that there was retaliation due to Plaintiff's FMLA leave. The Family Medical Leave Act ("FMLA") balances the demands of the workplace with the needs of employees to take leave for eligible medical conditions. 29 U.S.C. § 2601(b); *Freemon v. Foley*, 911 F. Supp. 326, 329 (D. Ill. 1995). The FMLA provides eligible employees with up to twelve weeks of unpaid leave, and ensures that those who take such leave will be restored to their former position or an equivalent one upon returning to work. 29 U.S.C. § 2614(a)(1); *Id*. Plaintiff claims that his FMLA leave, beginning July 5, 2004, was the reason for his loss of position, in violation of the FMLA.

The evidence does not support the Plaintiff's claim. Wilson testified that the decision to layoff Plaintiff was made on June 25, 2004, two weeks before Plaintiff's FMLA leave. Defendant presents an excel list of salaried employers, including Plaintiff, who were going to be laid-off after the strike ended, and a screen-shot of records indicating that the file was last modified on June 25, 2004. Together, these files show that the decision to layoff the Plaintiff was made by June 25, 2004. Plaintiff presents no evidence to the contrary. Plaintiff argues that Iniquez's September 17, 2004 email to Wilson suggests that the layoff date was after the strike, and after Plaintiff took FMLA leave. However, as discussed above, the strike began almost two weeks before June 25, 2004. The fact that the email contained discussion of the strike is not proof that the layoff decision was made after the strike, and is consistent with the presented evidence that the decision was made on June 25, 2005. The presented evidence indicates that the decision to layoff the Plaintiff was made before Plaintiff's FMLA leave. Thus, a reasonable jury

could not find for the non-moving party. Defendant's motion for summary judgment on the FMLA claim is granted.

IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED.

Enter:

/s/David H. Coar

_____

David H. Coar

United States District Judge

**Dated: November 2, 2006**